**JUDGE BAER**

**08 CV 3693**

HUGHES HUBBARD & REED LLP
William T. Bisset (WB-5817)
350 South Grand Avenue
36th Floor
Los Angeles, California  90071-3442
Tel:  (213) 613-2881

HUGHES HUBBARD & REED LLP
James B. Kobak, Jr. (JK-1218)
One Battery Park Plaza
New York, New York  10004
Tel. (212) 837-6000

*Attorneys for Plaintiff*



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

DISCOVISION ASSOCIATES, a California partnership,

            Plaintiff,

    v.

TOSHIBA CORPORATION, a Japanese corporation,

            Defendant.

---

Case No. _____

**COMPLAINT**

Plaintiff Discovision Associates ("DVA"), by its undersigned attorneys, complains of defendant Toshiba Corporation ("Toshiba") and alleges, upon personal knowledge with respect to itself and its acts and on information and belief as to all other matters, as follows:

### PARTIES

1.      DVA is a California general partnership whose two partners are Pioneer Electronics (USA) Inc. and Pioneer Electronics Capital Inc., both of which are corporations organized under the laws of Delaware and have their principal places of business in California. DVA is the owner of various patents covering optical technology.

2.     Toshiba is a corporation organized under the laws of Japan. Among other things, Toshiba, directly and through its subsidiaries, manufactures, buys and sells optical recording and playback products such as CD and DVD players. Toshiba and its subsidiaries have thousands of employees and do business throughout the world, including in New York.

## JURISDICTION

3.     The Court has jurisdiction under 28 U.S.C. § 1322 because the parties are of diverse citizenship and the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

## FACTS COMMON TO ALL CLAIMS FOR RELIEF

4.     As of March 31, 2003, Toshiba and DVA entered into a Non-Exclusive Limited Worldwide Patent License Agreement For Playback and Recording Products ("License Agreement"), a true and correct copy of which is attached hereto as Exhibit 1 (redacted in accordance with § 14.1 of the License Agreement to protect the confidentiality of certain terms). The License Agreement is binding on Toshiba's "Subsidiaries" within the meaning of § 2.24 of the License Agreement, *i.e.*, any corporation, company or other business entity of which Toshiba has direct or indirect beneficial ownership of greater than 50% of the voting securities or greater than 50% interest in the income ("Subsidiaries"). Under the subsections of § 12, the License Agreement is governed by New York law and any dispute that arises under or relates to the License Agreement shall be resolved exclusively in whatever court situated in the State of New York DVA elects.

5.     Section 6.7 of the License Agreement requires Toshiba to permit independent auditors selected by DVA to examine such records and other documents of Toshiba and its Subsidiaries as may be necessary to verify or determine royalties paid or payable under the License Agreement. On August 15, 2006, DVA demanded in writing that Toshiba submit to an audit to be performed by Deloitte & Touche LLP ("D&T") covering all quarterly reporting periods ending June 30, 2003 through March 31, 2006. A true and correct copy of DVA's demand letter is attached hereto as Exhibit 2.

-2-

40027735_1.DOC

6.     By letter to Toshiba dated September 7, 2006, D&T followed up with a list of information it requested to perform the audit. A true and correct copy of D&T's letter is attached hereto as Exhibit 3.

7.     Under § 6.7, the independent auditors would complete their audit and report to DVA only the amount of royalties due and payable, thus following the agreed method for protecting the confidentiality of Toshiba's information. Despite its agreement, Toshiba and its Subsidiaries have not allowed the independent audit to proceed, for 18 months and counting, on the purported basis of confidentiality concerns. Thus they breached their obligations under the License Agreement by, among other things, failing and refusing, despite DVA's repeated demands, to permit an independent audit under § 6.7 of the License Agreement to verify or determine royalties paid or payable under the License Agreement.

8.     In addition, Toshiba and its Subsidiaries have not provided DVA with all of the reports required under § 6.4 of the License Agreement.

9.     Without the required audit and reports, DVA cannot determine whether Toshiba and its Subsidiaries have accurately reported to DVA and paid DVA the amount due under the License Agreement. The unjustified refusal by Toshiba and its Subsidiaries (a) to permit the audit to proceed and (b) to submit reports in timely fashion has caused DVA to incur substantial additional expense.

10.     DVA has performed all obligations under the License Agreement on its part to be performed.

**FIRST CLAIM FOR RELIEF:     BREACH OF CONTRACT REGARDING AUDIT**

11.     DVA repeats each allegation contained in paragraphs 1 through 10 of this complaint as if fully set forth at length.

12.     Without valid cause or excuse and despite numerous requests, Toshiba and its Subsidiaries failed and refused to permit an audit, and thereby have breached their obligations under § 6.7 of the License Agreement.

40027735_1.DOC

13.     Absent an order requiring Toshiba to permit the required audit to proceed, DVA has no adequate remedy at law.

14.     DVA is entitled to specific performance by Toshiba and its Subsidiaries of their audit obligations and an order requiring Toshiba and its Subsidiaries to provide Deloitte with all information required to perform the audit and otherwise to permit and cooperate with the audit.

**SECOND CLAIM FOR RELIEF:     ACCOUNTING**

15.     DVA repeats each allegation contained in paragraphs 1 through 10, 12, 13 and 14 of this complaint as if fully set forth herein.

16.     DVA is entitled to an accounting from Toshiba and its Subsidiaries of every manufacture, use, lease, rent, sale (alone or in combination with other products) and/or transfer of any Licensed Product by or for any of them from March 31, 2003 through March 31, 2006, including without limitation provision to DVA of all reports required under § 6.4 of the License Agreement.

**THIRD CLAIM FOR RELIEF:     SPECIFIC PERFORMANCE**

17.     DVA repeats each allegation contained in paragraphs 1 through 10, 12, 13, 14 and 16 of this complaint as if fully set forth herein.

18.     DVA is entitled to specific performance by Toshiba and its Subsidiaries of their obligations under the License Agreement, including their reporting obligations under § 6.4.

19.     DVA has no adequate remedy at law.

**FOURTH CLAIM FOR RELIEF:     DAMAGES FOR BREACH OF CONTRACT**

20.     DVA repeats each allegation contained in paragraphs 1 through 10, 12, 13, 14, 16, 18 and 19 of this complaint as if fully set forth herein.

21.     Toshiba and its Subsidiaries breached the License Agreement by failing and refusing to permit and cooperate with the audit demanded by DVA and failing and refusing to comply with their reporting obligations.

22.    DVA is entitled to recover the amount that the audit and other reporting show is due, plus interest thereon, plus reimbursement of amounts paid to D&T or any other auditor if an error in royalties of more than 3% of the total royalties due is discovered for any year examined.

23.    DVA also is entitled to recover the additional expenses it has incurred as a result of the breaches by Toshiba and its Subsidiaries.

**FIFTH CLAIM FOR RELIEF:    DECLARATORY RELIEF
REGARDING AUDIT RIGHTS**

24.    DVA repeats each allegation contained in paragraphs 1 through 10, 12, 13, 14, 16, 18, 19 and 21 through 23 of this complaint as if fully set forth herein.

25.    DVA is entitled to a declaratory judgment that Toshiba and its Subsidiaries are required to submit to an independent audit of their records under § 6.7 of the License Agreement.

**SIXTH CLAIM FOR RELIEF:    DECLARATORY JUDGMENT
REGARDING ROYALTY REPORTS**

26.    DVA repeats each allegation contained in paragraphs 1 through 10, 12, 13, 14, 16, 18, 19, 21 through 23 and 25 of this complaint as though fully set forth herein.

27.    DVA is entitled to a declaratory judgment that Toshiba and its Subsidiaries are required to provide additional reports under § 6.4 of the License Agreement.

**DEMAND FOR RELIEF**

WHEREFORE, DVA is entitled to judgment as follows:

a.    specific performance by Toshiba and its Subsidiaries of their audit obligations and order requiring Toshiba and its Subsidiaries to provide Deloitte with all information appropriate to perform the audit, and otherwise to permit and cooperate with the audit by Deloitte, of all quarterly periods from March 31, 2003 through March 31, 2006, in accordance with § 6.7 of the License Agreement and DVA's First Claim For Relief;

b.    an accounting from Toshiba and its Subsidiaries in accordance with DVA's Second Cause of Action, including without limitation provision of all reports required under § 6.4 of the License Agreement;

c.      specific performance of all contractual obligations of Toshiba and its Subsidiaries in accordance with DVA's Third Claim For Relief, including their reporting obligations under § 6.4 of the License Agreement;

d.      damages and reimbursement of fees and expenses in an amount to be proved at trial in accordance with DVA's Fourth Claim For Relief;

e.      declaratory judgments in accordance with DVA's Fifth and Sixth Claim For Relief;

f.      an award of pre-judgment and post-judgment interest;

g.      an award of costs; and

h.      such other, further and different relief as this Court deems just and proper.

**JURY DEMAND**

DVA demands trial by jury for all claims so triable.


Dated:        New York, New York
              April 17, 2008


                                    HUGHES HUBBARD & REED LLP

                                    William T. Bisset
                                    350 South Grand Avenue
                                    36th Floor
                                    Los Angeles, California  90071-3442
                                    Tel:  (213) 613-2881
                                    Fax:  (213) 613-2950
                                    email:  bisset@hugheshubbard.com


                                    HUGHES HUBBARD & REED LLP

                                    James B. Kobak Jr.
                                    One Battery Park Plaza
                                    New York, New York  10004-1482
                                    Tel:  (212) 837-6757
                                    Fax:  (212) 422-4726
                                    email:  kobak@hugheshubbard.com


                          By:    _William T. Bisset (md)_____

                                    William T. Bisset
                                    Attorneys for Plaintiff
                                    Discovision Associates

# EXHIBIT 1

TOSHIBA-PLAYERS & RECORDERS-PREPAID-XP-WW-031403



# NON-EXCLUSIVE LIMITED WORLDWIDE PATENT LICENSE AGREEMENT
## FOR
## PLAYBACK AND RECORDING PRODUCTS

This Agreement is effective the 31st day of March, 2003 (the "Effective Date"), between DISCOVISION ASSOCIATES, a joint venture subject to the State of California partnership law, having a place of business at 2355 Main Street, Suite 200, Irvine, California 92614, United States of America ("DVA") and TOSHIBA CORPORATION, a Japanese corporation, having a place of business at 1-1, Shibaura, 1-chome Minato-ku, Tokyo 105-8001, Japan ("LICENSEE"), who agree as follows:

## Section 1.0  Recitals

1.1    This Agreement has been entered into between the parties in order to avoid patent litigation and is a settlement of all outstanding controversies between the parties concerning the subject matter hereof.  LICENSEE hereby acknowledges it has entered into this Agreement for, among other things, the freedom to design its products and not necessarily related to specific patent use.

1.2    LICENSEE has been offered, at its sole discretion, the choice of two licensing alternatives. Under the first licensing option, LICENSEE could accept a license under all **Licensed Patents** (as defined in Section 2.21). Alternatively, LICENSEE may accept a license under one or more individual DVA patents selected by LICENSEE, the availability of such license under any one or more of DVA's patents being in no way conditioned on the need for LICENSEE to take a license under any other of DVA's patents.  LICENSEE has determined that its business interest will be best served by taking a license under the terms and conditions of this Agreement.

1.3    In lieu of selecting either option described in Section 1.2 above, LICENSEE requested DVA provide a pre-paid license for **Discharged Licensed Products** (as defined in Section 2.18), as well as other business terms deemed vital to LICENSEE.  As an accommodation to LICENSEE, DVA has agreed to provide the license requested by LICENSEE, subject to all terms and conditions of this Agreement.

TOSHIBA-PLAYERS & RECORDERS-PREPAID-XP-WW-031403

### Section 2.0 Definitions

2.1 **"Disc(s)"** means any pre-recorded, non-recordable and non-erasable information storage medium in the shape of a disc and having information recorded thereon in one or more information bearing layers, which information is recoverable using optical detection means.

2.2 **"Digital Disc(s)"** means a **Disc** having pre-recorded thereon digitally encoded information. **Digital Discs** include, but are not limited to, **Discs** commonly known as CD Digital Audio Discs (i.e., compact discs), CD Single Discs (i.e., containing only twenty minutes or less of audio entertainment information), CD-ROM Discs, CD-I Discs, CD-G Discs, CD Digital Video Discs, Video CD's, DVD Video Discs, DVD ROM Discs and **Pre-Recorded Mini Discs**.

2.3 **"Pre-Recorded Mini Disc(s)"** means a **Digital Disc** having a diameter of 65 millimeters or less, capable of storing not more than 150 megabytes of data, and is otherwise defined in a specification published by Sony Corporation and commonly referred to as the "Rainbow Book."

2.4 **"Video Disc(s)"** means a **Disc** having pre-recorded thereon video information which is not digitally encoded. **Video Discs** include, but are not limited to, **Discs** commonly known as laser discs (LD's), karaoke laser-discs and compact disc-video (CD-V) discs.

2.5 **"Recordable Media"** means an information storage medium in the shape of a disc, other than a master disc, capable of having information recorded thereon by an optical recording beam, which information is recoverable using optical detection means. **Recordable Media** include, but are not limited to, Write-Once Media, Magneto-Optical Media (e.g., 3.5", 5.25", etc.), Phase-Change Media, Recordable Compact Discs, CD-RW Media, CD-E Media, DVD-RAM Media, DVD Rewritable (DVD-RW) Media, DVD Recordable (DVD-R) Media, DVD Erasable (DVD-E) Media and **Recordable Mini Discs**.

2.6 **"Recordable Mini Disc(s)"** means a **Recordable Media** having a diameter of 65 millimeters or less, capable of storing not more than 150 megabytes of data, and is otherwise defined in a specification published by Sony Corporation and commonly referred to as the "Rainbow Book."

2.7 **"Manufacturing Apparatus"** means apparatus for use in the fabrication of **Licensed Products**, including apparatus used in performing quality assurance

7

procedures or testing of **Licensed Products**. **Manufacturing Apparatus** includes, but is not limited to, mastering equipment, disc replication equipment, master discs and stampers.

2.8    "**Manufacturing Process(es)**" means any method or process, including related apparatus, used in the fabrication of **Licensed Products**, including process steps directed to quality assurance procedures or testing of **Licensed Products**.

2.9    "**Digital Playback Product(s)**" means an apparatus primarily designed for recovering digitally encoded information from an information storage medium in the shape of a disc using optical detection means. Such apparatus shall not be capable of recording information on, or erasing information from, an information storage medium. **Digital Playback Products** include, but are not limited to, Compact Disc Digital Audio Players, Compact Disc Read Only Memory (CD-ROM) Players, Compact Disc Interactive (CD-I) Players, Compact Disc Graphics (CD-G) Players, Video CD Players, DVD Video Playback Products, DVD ROM Playback Products and **Mini Disc Playback Products**.

2.10    "**Mini Disc Playback Product(s)**" means a **Digital Playback Product** primarily designed for recovering audio entertainment information from a **Pre-Recorded Mini Disc**.

2.11    "**Premium Mini Disc Playback Product(s)**" means a **Mini Disc Playback Product** with a **Net Selling Price** greater than one thousand United States dollars (U.S. $1,000).

2.12    "**Video Playback Product(s)**" means an apparatus primarily designed for recovering video information from an information storage medium in the shape of a disc using optical detection means, which video information is not digitally encoded.  Such apparatus shall not be capable of recording information on, or erasing information from, an information storage medium. **Video Playback Products** include, but are not limited to, video disc (VD) players, laser disc (LD) players and compact disc-video (CD-V) players.  **Video Playback Products** also shall include multiple format playback apparatus capable of recovering information from a **Video Disc** and a **Digital Disc** (e.g., DVD/LD or DVD/CD/LD combination or "combi" players capable of recovering information from a DVD Video Disc and a laser disc).  If DVA and LICENSEE cannot agree as to whether a particular playback product is a **Digital Playback Product** or a **Video Playback Product**, then such playback product shall be deemed to be a **Video Playback Product**.

2.13 **"Recording Product(s)"** means an apparatus, other than **Manufacturing Apparatus**, primarily designed for recording information on **Recordable Media**. Such apparatus may also be capable of recovering or erasing information from **Recordable Media**. **Recording Products** include, but are not limited to, Write Once Read Many (WORM) Drives, Magneto-Optical Drives (e.g., 3.5", 5.25", etc.), Phase-Change Drives, CD-R Drives, CD-RW Drives, CD-E Drives, DVD-RAM Drives, DVD Rewritable (DVD-RW) Drives, DVD Recordable (DVD-R) Drives, DVD Erasable (DVD-E) Drives and **Mini Disc Recording Products**. A Phase-Change Drive means a **Recording Product** that is exclusively designed for use with Phase-Change Media. For purposes of this Agreement, any **Recording Product** capable of recording information on or recovering information from Phase-Change Media and any other **Recordable Media** shall <u>not</u> be a Phase-Change Drive. A 3.5" Magneto-Optical Drive means a **Recording Product** that is exclusively designed for use with 3.5" Magneto-Optical Media. For purposes of this Agreement, any **Recording Product** capable of recording information on or recovering information from 3.5" Magneto-Optical Media and any other **Recordable Media** shall <u>not</u> be a 3.5" Magneto Optical Drive.

2.14 **"Mini Disc Recording Product(s)"** means a **Recording Product** primarily designed for recording information on a **Recordable Mini Disc**. A **Mini Disc Recording Product** may also be capable of recovering information from a **Recordable Mini Disc**. **Mini Disc Recording Products** specifically include, but are not limited to, mini disc apparatus designed for business-related or computer-related usage. If DVA and LICENSEE cannot agree whether a particular mini disc apparatus is a **Mini Disc Playback Product** or a **Mini Disc Recording Product**, then such mini disc apparatus shall be deemed to be a **Mini Disc Recording Product**.

2.15 **"Premium Mini Disc Recording Product(s)"** means a **Mini Disc Recording Product** with a **Net Selling Price** greater than one thousand United States dollars (U.S. $1,000).

2.16 **"Kit(s)"** means a part, or an aggregation of parts, designed and intended to be incorporated or assembled into a **Digital Playback Product**, a significant portion of a **Digital Playback Product**, a **Video Playback Product**, a significant portion of a **Video Playback Product**, a **Recording Product** or a significant portion of a **Recording Product**. A **Kit** may be, for example, any one of the following:

*7*

Type I Kit   -   optical head;

Type II Kit   -   aggregation of optical head and mechanical deck;

Type III Kit   -   aggregation of optical head, mechanical deck and signal processing and control electronics;

Type IV Kit   -   aggregation of optical head, mechanical deck, signal processing and control electronics, power supply and casing.

2.17   "Licensed Product(s)" means **Digital Playback Products**, **Video Playback Products** and **Recording Products**. Kits are <u>not</u> licensed under this Agreement.

REDACTED

TOSHIBA-PLAYERS & RECORDERS-PREPAID-XP-WW-031403

2.21  "**Licensed Patent(s)**" means the patents and any patents issuing from pending patent applications owned or subject to license by DVA as of the Effective Date, which relate to the **Licensed Products** or any **Manufacturing Apparatus** or any **Manufacturing Process**, under which patents and patent applications (as well as divisionals, continuations and continuation-in-part applications, reissues and reexaminations) DVA has the right to grant licenses to LICENSEE of the same scope granted herein; provided, however, that such grant, or the exercise of rights under such grant, will not result in the payment of royalties or other consideration by DVA to third parties (except for payments to third parties for inventions made by said third parties while employed by DVA). The parties agree that such patents are all the patents under which LICENSEE has agreed to take a license. LICENSEE understands that DVA owns or has the right to license numerous other patents not related to the **Licensed Products**, which are not licensed under this Agreement.

2.22  "**Transfer**" means (i) rent, lease, sell or sold; (ii) deliver to others (including for export) other than by sale, regardless of the basis of compensation, if any, (for example, by consignment, by gift or by transshipment through an intermediate country or territory); or (iii) sell (sold) in combination with other products.

2.23  "**Type Number**" means any combination of numbers, letters and/or words used to identify a particular type or model of **Licensed Product**.

2.24  "**Subsidiary(ies)**" means any corporation, company, or other business entity controlled by LICENSEE. For this purpose, control means direct or indirect beneficial ownership of greater than fifty percent (50%) of the voting securities or greater than fifty percent (50%) interest in the income of such corporation, company, or other business entity.

2.25  "**Arm's Length Trade**" means a sale, lease or other commercial transaction between unaffiliated parties having an adverse economic interest. After completion of an **Arm's Length Trade**, a party thereto will derive no further economic benefit from subsequent transactions by another party thereto with respect to the goods involved in such **Arm's Length Trade**.

2.26  "**Net Selling Price**" means the invoice price after discounts actually allowed for a **Licensed Product** sold in **Arm's Length Trade** by LICENSEE or its **Subsidiary**, such price not to include:  (1) packaging costs incurred by LICENSEE for such **Licensed Product**; (2) insurance fees and packing and transportation charges incurred by LICENSEE and paid to a third party; (3) duties and sales taxes actually

incurred and paid by LICENSEE in connection with delivery of such **Licensed Product**; and (4) the cost of any patent license fee paid by LICENSEE to a third party with respect to the manufacture of the **Licensed Product**. In respect of a **Licensed Product** used or leased by LICENSEE or its **Subsidiary** or **Transferred** in other than **Arm's Length Trade** by LICENSEE or its **Subsidiary**, the **Net Selling Price** shall be deemed to be equal to the average **Net Selling Price** as defined above for the same or equivalent **Licensed Product** sold in **Arm's Length Trade** during the then current accounting period. If there are no sales in **Arm's Length Trade** during an accounting period, DVA and LICENSEE shall attempt to agree upon an amount to be regarded as the **Net Selling Price** for such accounting period. If DVA and LICENSEE do not so agree, then **Net Selling Price** shall mean the actual selling price to an end-user consumer. If a **Licensed Product** is not separately sold and is included with other apparatus, then the **Net Selling Price** of such **Licensed Product** shall be the **Net Selling Price** of the equivalent **Licensed Product** which is separately sold, or, if no such equivalent **Licensed Product** exists, shall be, at LICENSEE's option, either: (1) the sales price as aforesaid of such other apparatus multiplied by the ratio of the **Manufacturing Cost** of such **Licensed Product** to the **Manufacturing Cost** of such other apparatus; or (2) one hundred fifty percent (150%) of the **Manufacturing Cost** of that part of the apparatus that constitutes the **Licensed Product**.

2.27    "**Manufacturing Cost**" means total cost of direct materials, direct and indirect factory labor and factory overhead determined in accordance with sound accounting principles.

2.28    "**Toll Conversion/Sell-Back Arrangement(s)**" means arrangements similar to the transactions described *in E.I. du Pont de Nemours & Co. Inc. v. Shell Oil Co.* 227 USPQ 233 (D. Del. 1985) the net result of which constitutes an attempt to sublicense a third party. Said arrangements also include, but are not limited to, transactions between LICENSEE and a third party wherein LICENSEE obtains **Licensed Products** from said third party and then LICENSEE **Transfers** those **Licensed Products** back to the third party. It is understood that such arrangements are not limited to direct transactions between LICENSEE and a third party, but may also involve affiliates thereof and/or other intermediate entities.

2.29    "**Toshiba Patent(s)**" means LICENSEE's patents and patent applications that LICENSEE or its **Subsidiaries** now has or hereafter, during the term of this Agreement, obtains the right to license (including continuations, utility models, design patents, divisionals, extensions, continuations-in-part, reissues, reexaminations and foreign counterparts thereto) to the extent that the inventions

TOSHIBA-PLAYERS & RECORDERS-PREPAID-XP-WW-031403

claimed and described therein relate to any **Licensed Product, Manufacturing Apparatus** and/or **Manufacturing Process.**

## Section 3.0  Non-Exclusive License Grant

3.1     DVA grants to LICENSEE a worldwide, non-exclusive, royalty bearing license under the **Licensed Patents** (i) to make, have made, use, offer to sell or **Transfer Licensed Products**; and (ii) to make or use **Manufacturing Apparatus** and to use **Manufacturing Processes** to manufacture **Licensed Products** for LICENSEE.

DVA reserves the right to bring a patent infringement action against LICENSEE with respect to any patents owned or subject to license by DVA but not licensed under this Agreement.

3.2     No license is granted by DVA to LICENSEE, either expressly or by implication, estoppel, or otherwise (i) other than under the **Licensed Patents**, (ii) with respect to any products other than **Licensed Products**; (iii) to offer to sell or **Transfer** any **Manufacturing Apparatus**; or (iv) to offer to sell or **Transfer** any **Manufacturing Process** or process step thereof.

3.3     LICENSEE understands that any **Standard Licensed Product** manufactured, used, or **Transferred** in a country for which a lower royalty rate applies, is not deemed licensed in a country for which a higher royalty rate applies, provided that LICENSEE has only paid such lower royalty rate. If LICENSEE is manufacturing **Standard Licensed Products** in an OEM capacity and does not know the final destination of such **Standard Licensed Products**, LICENSEE agrees to inform any purchaser of such **Standard Licensed Products** that a further royalty may be due DVA. Such royalty shall be the difference between the royalty rate paid by LICENSEE to DVA and the royalty rate attributable to the country with the higher royalty rate if such country is the final destination of such **Standard Licensed Products**. In furtherance of the foregoing, LICENSEE shall include the following language in all purchase agreements and orders:

THE PURCHASER OF THE PRODUCTS BEING SOLD OR OTHERWISE TRANSFERRED HEREUNDER IS HEREBY NOTIFIED THAT IT IS RESPONSIBLE FOR PAYING A ROYALTY ON THESE PRODUCTS TO DISCOVISION ASSOCIATES IF: (i) THESE PRODUCTS ARE SUBSEQUENTLY USED, SOLD OR OTHERWISE TRANSFERRED IN JAPAN OR THE UNITED STATES (INCLUDING U.S. TERRITORIES AND POSSESSIONS) AND

(ii) THE OEM MANUFACTURER HAS NOT FULLY PAID TO DISCOVISION ASSOCIATES THE ROYALTY RATES DUE ON SUCH PRODUCTS FOR LICENSING ACTIVITY IN SUCH COUNTRIES. SUCH PRODUCTS SHALL REMAIN UNLICENSED UNLESS AND UNTIL DISCOVISION ASSOCIATES RECEIVES FULL ROYALTIES THEREON.

DVA reserves the right to seek royalties from third parties for the manufacture, use and/or **Transfer** of products licensed hereunder for which LICENSEE has not fully paid the royalty under this Agreement, as described above.

3.4   The license granted herein includes a license to LICENSEE's **Subsidiaries** of the same scope as the one granted to LICENSEE in Section 3.1 above. LICENSEE represents that its **Subsidiaries** include the **Subsidiaries** identified on Appendix A, which are involved in the manufacture of **Licensed Products** as of the Effective Date. LICENSEE shall pay and account to DVA for royalties hereunder with respect to the exercise by any **Subsidiary** of LICENSEE of the license granted to it hereunder, and if LICENSEE fails to make such payment or accounting, DVA reserves the right to seek directly from such **Subsidiary** any royalties due and owing to DVA. Licenses will be granted to additional **Subsidiaries** of LICENSEE, which are not existing as of the Effective Date, during the term of this Agreement upon receipt by DVA of written notices from LICENSEE setting forth the names and addresses of such additional **Subsidiaries** to be covered by this Agreement. Each **Subsidiary** licensed under this Agreement shall be bound by the terms and conditions of this Agreement as if it were named herein in the place of LICENSEE. LICENSEE represents to DVA that it has the power to bind each such **Subsidiary** to the terms and conditions of this Agreement. The license granted to a **Subsidiary** shall terminate on the date such **Subsidiary** ceases to be a **Subsidiary**.

REDACTED

7

TOSHIBA-PLAYERS & RECORDERS-PREPAID-XP-WW-031403

3.5    LICENSEE may not sublicense third parties under this Agreement, except for **Subsidiaries** as provided for in Section 3.4 above. **Toll Conversion/Sell-Back Arrangements** are deemed to be a prohibited attempt to sublicense a third party and constitute a material breach of this Agreement.

## Section 4.0  Release

4.1    DVA hereby releases LICENSEE and its **Subsidiaries** existing as of the Effective Date from all claims of infringement of the **Licensed Patents**, with respect to (i) any **Licensed Products** used or **Transferred** by or for LICENSEE or its **Subsidiaries** before the Effective Date, to the extent such **Licensed Products** would have been licensed hereunder had they been manufactured, used or otherwise **Transferred** after the Effective Date and (ii) any **Kits** used or **Transferred** by or for LICENSEE or its **Subsidiaries** before the Effective Date, subject to section 4.3 below. This release shall not apply to (i) any **Licensed Product** on which a royalty accrues after the Effective Date and (ii) **Kits** manufactured, used or **Transferred** by or for LICENSEE or its **Subsidiaries** after the Effective Date, subject to Section 4.2 below. This release applies only to the **Licensed Patents** and does not apply to any other patents owned or subject to license by DVA. LICENSEE may remain liable for infringement of other patents owned or subject to license by DVA. While the parties understand that the release granted in this Section 4.1 is valid as of the Effective Date, the parties acknowledge that the release granted in this Section 4.1 shall be deemed void if LICENSEE fails to make the first two payments set forth in Section 5.7 of this Agreement.

4.2    DVA will not assert any claims for infringement against LICENSEE and its **Subsidiaries** with respect to any **Kits** manufactured, used or **Transferred** by LICENSEE or such **Subsidiary** after the Effective Date, for the term of this Agreement.

4.3    No release, non-assertion nor license, express or implied, is granted to any party to whom LICENSEE or its sublicensed **Subsidiaries** may have **Transferred Kits** before or after the Effective Date for the manufacture, use or **Transfer** by such party of assembled products using such **Kits**. DVA reserves all rights with respect to such **Kits**, including the right to collect from such party or their customers a payment for assembled products using such **Kits**.

7

## Section 5.0 <u>Royalties and other Payments</u>

5.1    LICENSEE shall pay, as hereinafter provided, earned royalties to DVA for (i) each **Licensed Product** for which LICENSEE is licensed hereunder in the country of manufacture; and (ii) each **Licensed Product** for which LICENSEE is licensed hereunder in the country of use or **Transfer**.

5.2    Subject to Section 3.3, no more than one royalty shall be due for each **Licensed Product**, regardless of the number of countries in which the manufacture, use or **Transfer** of such **Licensed Product** occurs. Such royalty shall be the royalty for the country of activity for which the royalty is highest.

REDACTED

5.4    LICENSEE shall pay to DVA the following royalties for each **Standard Licensed Product**:

    5.4.1    For each **Video Playback Product** which is manufactured, used and/or **Transferred** by or for LICENSEE and/or its **Subsidiaries**, LICENSEE shall pay to DVA a royalty of one and one-half percent (1.5%) of the **Net Selling Price** of such **Video Playback Product**.

    5.4.2    For each **Digital Playback Product** a royalty as follows:

        5.4.2.1    if manufactured, used and/or **Transferred** by or for LICENSEE and/or its **Subsidiaries** in the United States, LICENSEE shall pay DVA a royalty of one percent (1.0%) of the **Net Selling Price** of such **Digital Playback Product**;

        5.4.2.2    if manufactured, used and/or **Transferred** by or for LICENSEE and/or its **Subsidiaries** in Japan, but not manufactured, used and/or **Transferred** by or for LICENSEE and/or its **Subsidiaries** in the United States, LICENSEE shall pay DVA a royalty of sixty one-hundredths of one percent (0.60%) of the **Net Selling Price** of such **Digital Playback Product**;

        5.4.2.3    if manufactured, used and/or **Transferred** by or for LICENSEE and/or its **Subsidiaries** in any country in which a **Licensed Patent** exists, but not manufactured, used and/or **Transferred** by or for

LICENSEE and/or its **Subsidiaries** in the United States or Japan, LICENSEE shall pay DVA a royalty of thirty-five one-hundredths of one percent (0.35%) of the **Net Selling Price** of such **Digital Playback Product.**

5.4.3    As an alternative to the rates set forth in Section 5.4.2 above, for each **Mini Disc Playback Product** (except for **Premium Mini Disc Playback Products**) that is manufactured, used and/or **Transferred** by or for LICENSEE and/or its **Subsidiaries**, LICENSEE can elect to pay to DVA a royalty of one United States dollar (U.S. $1.00).

5.4.4    For each **Recording Product** a royalty as follows:

    5.4.4.1    if manufactured, used and/or **Transferred** by or for LICENSEE and/or its **Subsidiaries** in the United States, LICENSEE shall pay to DVA a royalty of one and one-half percent (1.5%) of the **Net Selling Price** of such **Recording Product;**

    5.4.4.2    if manufactured, used and/or **Transferred** by or for LICENSEE and/or its **Subsidiaries** in Japan, but not manufactured, used and/or **Transferred** by or for LICENSEE and/or its **Subsidiaries** in the United States, LICENSEE shall pay to DVA a royalty of one and twenty one-hundredths of one percent (1.2%) of the **Net Selling Price** of such **Recording Product;**

    5.4.4.3    if manufactured, used and/or **Transferred** by or for LICENSEE and/or its **Subsidiaries** in any country in which a **Licensed Patent** exists, but not manufactured, used and/or **Transferred** by or for LICENSEE and/or its **Subsidiaries** in the United States or Japan, LICENSEE shall pay to DVA a royalty of seventy one-hundredths of one percent (0.70%) of the **Net Selling Price** of such **Recording Product.**

5.4.5    As an alternative to the rates set forth in Section 5.4.4 above, for each **Phase-Change Drive** and each 3.5" **Magneto-Optical Drive** with a **Net Selling Price** equal to or less than One Thousand United States dollars (U.S. $1,000.00) that is manufactured, used and/or **Transferred** by or

for LICENSEE and/or its **Subsidiaries**, LICENSEE can elect to pay to DVA a royalty of four and one-half United States dollars ($4.50).

5.4.6   As an alternative to the rates set forth in Section 5.4.4 above, for each **Mini Disc Recording Product** (except for **Premium Mini Disc Recording Products**) that is manufactured, used and/or **Transferred** by or for LICENSEE and/or its **Subsidiaries**, LICENSEE can elect to pay to DVA a royalty of two United States dollars ($2.00).

5.4.7   For purposes of Section 5.4.5 above, a particular **Recording Product** shall be deemed to be a Phase Change Drive or a 3.5" Magneto-Optical Drive if, and only if, both DVA and LICENSEE agree that such **Recording Product** is a product commonly known as a Phase-Change Drive or a 3.5" Magneto-Optical Drive.

5.5   If at any time legal restrictions in the country of LICENSEE's place of business set forth in this Agreement prevent the prompt remittance of part or all of the royalties or other payments to DVA set forth in this Section 5.0, LICENSEE shall upon DVA's written request perform the following:

5.5.1   LICENSEE shall make such payments by depositing the amount thereof in local currency to DVA's account in a bank or other depository in such country; and

5.5.2   LICENSEE shall assist DVA to obtain authorization to remit such payments outside such country in equivalent U.S. currency.

5.6   No royalties shall be paid by LICENSEE for **Standard Licensed Products** manufactured by LICENSEE for any other DVA licensee, so long as the other DVA licensee has fully paid the royalty rate set forth in this Agreement in Section 5.4 and reported royalties to DVA on such **Licensed Products**, and LICENSEE has identified such other DVA licensee as the purchaser, and both LICENSEE and such other DVA licensee have both identified the other in their respective royalty reports due DVA reporting such transaction.  Notwithstanding the payment made to DVA pursuant to Section 5.7, LICENSEE shall pay the royalty rate for all other **Standard Licensed Products** as set forth in Section 5.4 of this Agreement.  DVA shall not be required, under any circumstances, to proceed against another DVA licensee or other third party for payment of such royalties.

REDACTED

### Section 6.0 Accruals, Records and Reports

6.1 Subject to Section 6.5 hereof, royalties accrue when any **Standard Licensed Product** is first put into use or first **Transferred**, whether or not payment is received by LICENSEE.

6.2 LICENSEE shall pay royalties and other sums of money due hereunder in United States dollars. All royalties for an accounting period computed on invoiced amounts in currencies other than United States dollars shall be converted directly into United States dollars, without intermediate conversions to another currency, at the Telegraphic Transfer Selling (TTS) rate quoted by either the Asian edition of the Wall Street Journal or the Citibank, N.A. branch office in Tokyo, Japan at the close of banking on the last business day of such accounting period. LICENSEE shall provide written confirmation of the quoted TTS rate directly to DVA with the royalty report.

6.3 An accounting period will end on the last day of each March, June, September and December during the term of this Agreement. The first accounting period under this Agreement will be for a period commencing on the Effective Date. Within sixty (60) days after the end of each such period, LICENSEE shall furnish to DVA the written reports containing the information specified in Section 6.4 and pay DVA all accrued royalties to the end of each such period. LICENSEE shall bear and pay, for its

activities and DVA's activities, all taxes required by its national government, including any political subdivision thereof, as the result of the existence or operation of this Agreement, except any necessary, appropriate and required national income tax imposed upon royalties or other payments by the national government of LICENSEE. LICENSEE may deduct or withhold such national income tax from said royalties or other payments, provided LICENSEE furnishes DVA with a tax certificate or other document evidencing payment of such income tax.

6.4    For each accounting period, LICENSEE shall submit a royalty report to DVA that contains the following information:

    6.4.1    identification by **Type Number**, brand name or label name (if applicable), **Licensed Product** type (for example, laser disc player, CD-ROM player, CD-R Drive, etc.), **Net Selling Price**, and quantity of each **Standard Licensed Product** type upon which royalty has accrued pursuant to this Agreement;

    6.4.2    for each **Standard Licensed Product** type, the name of the manufacturer, country of manufacture, and the countries in which LICENSEE first put into use or first **Transferred the Standard Licensed Products**;

    6.4.3    identification of the royalty basis used for each **Standard Licensed Product** type according to the provisions of Section 5.0, the amount of royalties due for each **Standard Licensed Product** type, all information required to show how such amount has been calculated, and the aggregate amount of all royalties due;

    6.4.4    identification by **Type Number**, brand name or label name (if applicable), and quantity of each **Standard Licensed Product** type that is exempt from royalty according to Section 5.7;

    6.4.5    Regardless of any quarterly report, for each accounting period ending in March, LICENSEE shall furnish to DVA a written report containing the following information:

REDACTED

7

TOSHIBA-PLAYERS & RECORDERS-PREPAID-XP-WW-031403

# REDACTED

In the event no royalties are due, LICENSEE's report shall so state.

6.5  Within thirty (30) days after termination or the expiration of this Agreement pursuant to Section 10.0 hereof, LICENSEE shall (i) provide DVA with a royalty report containing the information required by Section 6.4 hereof for all **Standard Licensed Products** on which royalty is payable hereunder but that was not previously reported and paid to DVA, and (ii) pay all royalties on such products.

    6.5.1  For purposes of this post-termination report, royalties shall accrue when any **Standard Licensed Product** is manufactured.

    6.5.2  For all **Standard Licensed Products** manufactured and used or otherwise **Transferred** prior to the termination or expiration of this Agreement, LICENSEE shall provide all the information required by Section 6.4 above and the royalty rates shall be determined as prescribed in Section 5.0 hereof.

    6.5.3  For all **Standard Licensed Products** manufactured prior to the termination or expiration of this Agreement but not used or otherwise **Transferred** prior to such termination or expiration, LICENSEE shall separately set forth such **Standard Licensed Products** and also provide all applicable information required by Section 6.4 hereof.

        6.5.3.1  For purposes of royalty calculations for the **Standard Licensed Products** described in Section 6.5.3, LICENSEE shall calculate the average royalty for **Standard Licensed Products** from the last royalty report provided to DVA, as follows:

$$\frac{\text{Total Royalty Payment*}}{\text{Total number of Licensed Products}} = \text{Average Royalty}$$

\* (pre-currency conversions and pre-tax withholding)

LICENSEE shall multiply the Average Royalty by the number of **Standard Licensed Products** in the post-termination report, which were manufactured prior to the termination or expiration of this Agreement but not used or otherwise **Transferred** prior to such termination or expiration.

6.6    LICENSEE's royalty reports shall be certified by an officer of LICENSEE or by a designee of such officer to be correct to the best of LICENSEE's knowledge and information.

6.7    LICENSEE shall keep separate records in sufficient detail to permit the determination of royalties payable hereunder. At the request of DVA, LICENSEE shall permit independent auditors or technical consultants selected by DVA to examine during ordinary business hours once in each calendar year such records and other documents as may be necessary to verify or determine royalties paid or payable under this Agreement. Such auditors or technical consultants shall be instructed to report to DVA only the amount of royalties due and payable. If no request for examination of such records for any particular accounting period has been made by DVA within three (3) years after the end of said period, the right to examine such records for said period, and the obligation to keep such records for said period, will terminate.

6.8    The fees and expenses of DVA's representatives performing any examination of records under Section 6.7 above shall be borne by DVA. However, if an error in royalties of more than three percent (3.0%) of the total royalties due is discovered for any year examined                    REDACTED            -

then the total fees and expenses of these representatives shall be borne by LICENSEE.

## Section 7.0  Interest on Overdue Royalties and Other Payments

7.1    LICENSEE shall be liable for interest at a rate of one percent (1.0%) per month compounded monthly on any overdue royalty or other payment required under this Agreement, commencing on the date such royalty or other payment becomes due. Interest on such overdue royalty or other payment shall continue to accrue, and the duty to pay such interest shall continue beyond any expiration or termination of this Agreement (including, without limitation, any termination under Section 10.0). If such interest rate exceeds the maximum legal rate in the jurisdiction where a claim therefor is being asserted, the interest rate shall be reduced to such maximum legal rate.

## Section 8.0  License to DVA

8.1   LICENSEE hereby grants to DVA a worldwide, non-exclusive, irrevocable, non-sublicensable, royalty-free license under the **Toshiba Patents** to make, have made or use **Licensed Products**, **Manufacturing Apparatus** and/or **Manufacturing Processes** solely in connection with Research and Development efforts by or on behalf of DVA.  The foregoing license shall be effective as of the date LICENSEE first pays royalties in accordance with Section 5.0 hereof and shall terminate concurrently with this Agreement.  Nothing contained herein shall be construed as providing DVA with a license under the **Licensee Patents** to directly or indirectly make, have made, use, sell, offer to sell or import **Licensed Products**, **Manufacturing Apparatus** and/or **Manufacturing Processes** for any commercial purpose.

8.2   The license as set forth in Section 8.1 shall not apply with respect to any patent of LICENSEE, if such grant would result in the payment of royalties by LICENSEE to third parties, except for payments to **Subsidiaries** of LICENSEE and payments to third parties for inventions made by said third parties while employed by LICENSEE or any of its **Subsidiaries**.

## Section 9.0  Assignments

9.1   LICENSEE shall not assign any of its rights or privileges hereunder (by operation of law or otherwise).

## Section 10.0  Term of Agreement; Termination

10.1   The term of this Agreement (and the license granted herein) will be from the Effective Date until March 31, 2006.  The license granted herein shall not extend, under any circumstances, beyond March 31, 2006.  LICENSEE and DVA agree to meet in June, 2005 to discuss extension of the license granted herein (including new royalty rates) or the grant of a new license subject to new terms and conditions and governing royalty rates.

10.2   LICENSEE may not terminate this Agreement.

10.3   DVA may terminate this Agreement if:

10.3.1   LICENSEE fails to make any payment when due under this Agreement and such payment is not made within sixty (60) days of written notice from DVA; or

TOSHIBA-PLAYERS & RECORDERS-PREPAID-XP-WW-031403

10.3.2    LICENSEE defaults under any material term of this Agreement, other than a default involving the payment of money or a default under Section 10.4 hereof, which default is not cured within thirty (30) days of written notice from DVA; or

10.3.3    LICENSEE becomes insolvent or admits in writing its inability to pay its debts as they mature or makes an assignment for the benefit of creditors; or

10.3.4    LICENSEE files a petition under any foreign or U.S. bankruptcy law.

The rights and remedies set forth in this section are not exclusive and are in addition to any other legal or equitable rights and remedies available to DVA.

10.4    If this Agreement or the license granted hereunder is terminated under this Section 10.0 or assigned under Section 9.0, the corresponding sublicenses granted to **Subsidiaries** under Section 3.4 will likewise terminate, but no notices need be given by DVA to such **Subsidiaries**.

10.5    Any expiration or termination of this Agreement under this Section 10.0, or any termination of a license under Section 3.4, will not relieve LICENSEE of any obligation or liability accrued before such expiration or termination (including, without limitation, the obligations set forth in Sections 5.0, 6.0 and 7.0), or rescind or give rise to any right to rescind anything done by LICENSEE or any payments made or other consideration given to DVA before the time such expiration or termination becomes effective, and such expiration or termination shall not affect in any manner any rights of DVA arising under this Agreement or at law or equity before such expiration or termination. LICENSEE's obligations under Sections 6.5 and 7.0 will survive any expiration or termination of this Agreement.

## Section 11.0  Payments, Notices and Other Communications

11.1    Any notice or other communication pursuant to this Agreement shall be made by registered airmail (except that registered or certified mail may be used where delivery is in the same country as mailing) and will be effective upon receipt by the addressee. Such notice or communication shall be mailed to:

*7*

TOSHIBA-PLAYERS & RECORDERS-PREPAID-XP-WW-031403

11.1.1    In the case of DVA:

Dennis Fischel
President
DISCOVISION ASSOCIATES
Post Office Box 19616
Irvine, California 92623
United States of America

11.1.2    In the case of LICENSEE:

Tsuneo Toda
General Manager
Intellectual Property Division
Digital Media Network Company
Toshiba Corporation
1-1, Shibaura, 1-chome
Minato-ku, Tokyo 105-8001
JAPAN

11.2  LICENSEE's royalty reports, as described in Section 6.0 of this Agreement, shall be mailed via air mail to:

DISCOVISION ASSOCIATES
ATTN:  Controller
Post Office Box 19616
Irvine, California 92623
United States of America

Fax No.:  (949) 660-1801

A summary of the report, which states the total royalty to be paid, shall be sent by facsimile to DVA on, or before, the mailing of the complete report.

11.3  All payments set forth in Section 5.0 of this Agreement shall be paid as follows:

1.    For all international payments paid via FED wire transfer using SWIFT payment:

*1*

Page 20 of 24

TOSHIBA-PLAYERS & RECORDERS-PREPAID-XP-WW-031403

Sumitomo Mitsui Banking Corporation,
New York Branch SMBCUS33
for the Account of Sumitomo Mitsui Banking Corporation,
Los Angeles Branch SMBCUS66
for Beneficiary Customer:  Discovision Associates
Account Number:  046 133013 70;

2.     for any other international payments paid via FED wire transfer **not** using SWIFT payment and all wire payments originating in the United States:

Sumitomo Mitsui Banking Corporation,
Los Angeles Branch
FED ABA Number:  122041594
for Beneficiary Customer:  Discovision Associates
Account Number:  046 133013 70;

3.     or by check payable to DVA and mailed via air mail directly to:

DISCOVISION ASSOCIATES
ATTN:  Controller
Post Office Box 19616
Irvine, California 92623
United States of America

## Section 12.0  Applicable Law; Venue; Jurisdiction

12.1  This Agreement shall be construed, and the legal relations between the parties shall be determined, in accordance with the laws of the State of New York (without giving effect to the choice of law provisions thereof).

12.2  Any dispute that arises under or relates to this Agreement shall, at DVA's election, be prosecuted exclusively in the appropriate court situated in the State of New York, United States of America. LICENSEE consents to the venue and jurisdiction of such court for purposes of any such dispute, and agrees (i) to be bound by such judgment and (ii) that a judgment of such court shall be enforceable in any jurisdiction in the world.

## Section 13.0  Miscellaneous

13.1  Nothing contained in this Agreement shall be construed as:

13.1.1  requiring the filing of any patent application, the securing of any patents or the maintenance of any patents; or

13.1.2    a warranty or representation by DVA as to the validity or scope of any **Licensed Patent**; or

13.1.3    a warranty or representation that the manufacture, use or **Transfer** of any **Licensed Product** is free from infringement of any patents or other rights of third parties; or

13.1.4    an obligation on the part of DVA to furnish any manufacturing or technical information, or any information concerning other licensees; or

13.1.5    an obligation upon DVA to determine the applicability of its patents to any of LICENSEE's products; or

13.1.6    a license with respect to any act which would otherwise constitute inducement of infringement or contributory infringement under United States patent law or its equivalent under any law foreign to the United States; or

13.1.7    conferring any right to use, in advertising, publicity, or otherwise, any name, trade name, trademark, service mark, symbol or any other identification or any contraction, abbreviation or simulation thereof; or

13.1.8    an obligation to bring or prosecute actions or suits against third parties for infringement of any patent.

13.2    LICENSEE shall have the complete responsibility and shall use its best efforts to obtain all necessary approvals and validations of this Agreement, including all necessary approvals and validations for any products made, used, rented, leased or sold hereunder.

13.3    The waiver by either party of a breach or default of any provision of this Agreement by the other party shall not be construed as a waiver of any succeeding breach of the same or any other provision, nor shall any delay or omission on the part of either party to exercise or avail itself of any right, power or privilege that it has or may have hereunder operate as a waiver of any right, power or privilege of such party.

13.4    Both parties intend to make this Agreement binding only to the extent that it may be lawfully done under existing applicable law as identified in Section 12.0. If any sentence, paragraph, clause or combination of the same is in violation of any

TOSHIBA-PLAYERS & RECORDERS-PREPAID-XP-WW-031403

applicable law, that portion which is in violation shall be severed from this Agreement and the remainder of this Agreement shall remain binding upon the parties hereto, except that no license is granted, expressly or by implication, estoppel or otherwise, unless royalties are paid under Section 5.0.

13.5   Each party represents and warrants that it has the full right and power to enter into this Agreement and that there are no outstanding agreements, assignments, or encumbrances to which the representing party is bound which may restrict, or prohibit entry into, or performance under, this Agreement. DVA further represents and warrants that it has the full power to grant the license and release set forth in Sections 3.0 and 4.0. Neither party makes any other representations or warranties, express or implied, other than the representations set forth in Section 3.4 regarding **Subsidiaries**.

13.6   The headings of the several sections are inserted for convenience of reference only and are not intended to affect the meaning or interpretation of this Agreement.

13.7   This Agreement may be executed in any number of copies, but all of such counterparts together shall constitute one and the same Agreement.

13.8   The parties acknowledge that this instrument sets forth the entire agreement and understanding of the parties hereto and supersedes all previous communications, representations and understandings, either oral or written, between the parties relating to the subject matter hereof, except prior written agreements signed by both parties, and shall not be subject to any change or modification except by the signing of a written instrument by or on behalf of both parties.

13.9   All references in this Agreement to the United States shall include its territories and possessions, the District of Columbia, and the Commonwealth of Puerto Rico.

13.10  Each party acknowledges that it has executed this Agreement with its full knowledge and understanding of its content, and with the consent and upon the advice of independent counsel of its own choice.  This Agreement shall be construed as if drafted by both LICENSEE and DVA and shall not be strictly construed against either party.

## Section 14.0   Confidentiality

14.1 The parties and their agents agree that they shall not disclose to others the contents of this Agreement except as required by law or in order to enforce their respective rights hereunder.  Notwithstanding the foregoing, this obligation of confidentiality

TOSHIBA-PLAYERS & RECORDERS-PREPAID-XP-WW-031403

does not preclude either party from divulging to others only the fact that the parties have reached an agreement on mutually acceptable terms and conditions, provided that, any press release by DVA regarding this Agreement requires prior written notice to LICENSEE.

**IN WITNESS WHEREOF,** the parties have caused this Agreement to be duly signed as of the dates written below, to be effective as of the Effective Date.

DISCOVISION ASSOCIATES

Witness:

By:     Dennis Fischel
Title:  President

Date:   _March 25, 2003_

TOSHIBA CORPORATION

Witness:

By:     Atsutoshi Nishida
Title:  President and CEO,
        Digital Media Network Company

Date:   _March 19, 2003_

P:\LICENSING\ADMIN\COMPANY\T\TOSHIBA\AGREEMEN\2003\TOSHIBA-P&R-PREPAID-WW-031403.DOC

TOSHIBA-PLAYERS & RECORDERS-PREPAID-XP-WW-031403

# APPENDIX  A

**LICENSEE'S Subsidiaries** as of the Effective Date are:

Toshiba Multi Media Devices Co., Ltd.
19, Minase, Oaza Fukihata
Goshogawara, Aomori Pref. 037-0003
Japan

Toshiba Information Equipment (Philippines), Inc.
103 East Main Avenue Extension
Special Export Processing Zone
Laguna Technopark
Binan, Laguna
Philippines

Company: _____
Address: _____
          _____
          _____

Company: _____
Address: _____
          _____
          _____

Company: _____
Address: _____
          _____
          _____

Company: _____
Address: _____
          _____
          _____

**APPENDIX  A**
**Page 1 of 1**

# EXHIBIT 2



August 15, 2006

**Via Facsimile 011-81-3-5444-9213**
**Mail Confirmation**

Mr. Tsuneo Toda
Senior Manager
Licensing & Contracts Dept., IP Division
**TOSHIBA CORPORATION**
1-1, Shibaura, 1-chome
Minato-ku, Tokyo 105-8001
JAPAN

Dear Toda-san:

This letter is to inform Toshiba Corporation that Discovision Associates intends to exercise its right to audit Toshiba as provided in the Non-Exclusive Limited Worldwide Patent License Agreement for Playback and Recording Products, effective March 31, 2003, between Toshiba and DVA (Agreement). Section 6.7 of the Agreement sets forth the audit right of DVA, including the right to have an independent auditor examine records and other documents necessary to determine royalties payable to DVA under the Agreement.

The audit will cover all royalty reporting periods from the period ending June 30, 2003 through the period ending March 31, 2006. A representative of DVA's auditor, Deloitte & Touche, will soon contact Toshiba to begin the audit process.

Sincerely,

**DISCOVISION ASSOCIATES**

Dennis Fischel
President

DF/mlt

P:\Licensing\Admin\DraftDirs\DRAFT-MT\LETTERS\ToshibaAudit081106.doc

# EXHIBIT 3

# Deloitte.

Deloitte Financial Advisory
Services LLP
Two World Financial Center
New York, NY 10281-1414
USA

Tel: +1 212 436 2000
Fax: +1 212 436 5000
www.deloitte.com

September 7, 2006

Mr. Tsuneo Toda
Senior Manager
Licensing & Contracts Dept., IP Division
Toshiba Corporation
1-1, Shibaura, 1-Chome
Minato-ku, Tokyo 105-8001
Japan

Re: Discovision Associates ("DVA") – Toshiba Corporation ("Toshiba") Matter

Dear Toda-san:

As we indicated in our letter dated September 5, 2006 and in Dennis Fischel's letter dated August 15, 2006, we have been authorized to perform an inspection of Toshiba pursuant to the License Agreement effective March 31, 2003, between DVA and Toshiba (the "Agreement"). We have compiled a preliminary list of records, reports and other items we will need to perform our procedures. We request that you provide this information to us by October 6, 2006. Once received, we will make our test selections and then forward them back immediately so that Toshiba will be able to locate supporting documentation such as invoices, shipping documents, payment documents, etc.

Please note that this is a preliminary list and we may request additional documents as the engagement progresses. Accordingly, please provide the following with respect to the sale of all products as defined in the Agreement (the "Licensed Products") for the period January 1, 2003 through March 31, 2006 (the "Period").

1) A listing and associated descriptions of all Licensed Products, product numbers (SKU number), technologies, and/or processes.

2) A description of the royalty reporting process and related flow chart for all Toshiba subsidiaries, including Toshiba Samsung Storage Technology Corporation ("TSST"), affiliates, and related parties making, using, selling, or transferring the Licensed Products.

3) A description of the inventory movement from production to distribution to final unaffiliated user sale and related flow charts for all Toshiba subsidiaries, affiliates, and related parties making, using, selling, or transferring the Licensed Products.

4) A description of any and all deductions taken against royalties payable to DVA during the Period.

5) Please provide updated royalty statements for the Period in accordance with section 6.4 of the Agreement. The royalty statement should include, but not be limited to, the brand or label name of the Licensed Products, the net selling price, the units sold, the name and country of the manufacturer, the corresponding royalty rate used for each standard licensed product, as defined in

Member of
Deloitte Touche Tohmatsu

Mr. Tsuneo Toda
September 7, 2006
Page 2

the Agreement, and the units sold that are exempt from royalties according to section 5.7 of the Agreement.

6) A listing of names and addresses of contact persons who are responsible for maintaining the supporting documentation for the royalty reports, including any such persons employed by Toshiba affiliates, subsidiaries or related parties.

7) Sales reports containing a detailed invoice listing of all Licensed Products sold from January 1, 2003 through March 31, 2006. This report should include, at a minimum, the invoice number, invoice date, customer name identified as an affiliate, subsidiary or unaffiliated user, country of sale, country of manufacture, model number, product number (SKU number), quantities sold, per unit prices, discounts given, and total invoiced price. Please provide this report in electronic form, i.e. Excel. This report should include all products shipped, even if they were bundled with other products. It is critical that we receive this report prior to the commencement of fieldwork.

8) Inventory reconciliation reports (with unit and dollar information) by Licensed Product (preferably in electronic form i.e. Excel):

   a. Beginning balance as of January 1, 2003
   b. Items manufactured, transferred in, returned from customers, purchased or otherwise added to inventory on a semi-annual basis
   c. Items sold, transferred out, returned to suppliers or otherwise subtracted from inventory on a semi-annual basis
   d. Ending inventory balance as of March 31, 2006

Please note, the units in the information above should be separated by manufacturer, country of manufacture and should include all Toshiba affiliates and subsidiaries.

9) Reconciliation from original customer invoiced amounts, for each royalty payment period, to the basis used by Toshiba to compute royalties payable to DVA. This reconciliation should contain detailed information for the amounts deducted by Toshiba such as packaging labor and materials, freight, royalties paid to other parties and all other costs used to derive the basis to pay royalties. Additionally, we would like an explanation for the types of deductions taken and any methods used to allocate costs to units sold (preferably in electronic format, i.e. Excel). Please provide this reconciliation as soon as possible.

10) List of third party suppliers and manufacturers that supply Licensed Products not manufactured by Toshiba but resold by Toshiba. In addition, please provide the total units purchased, semi-annually, from each of these third party manufacturers along with any agreements or other documentation.

11) All relevant price lists, including, but not limited to, catalogs of the Licensed Products.

12) Access to all accounting records, including but not limited to, accounts receivable and aging reports.

13) Access to all manufacturing facilities and personnel, including but not limited to, all Toshiba affiliates and subsidiaries.

14) Key personnel available to answer questions as they arise.

SEP-07-2006  23:56        DELOITTE & TOUCHE LLP                              P.03/03

Mr. Tsuneo Toda
September 7, 2006
Page 3

After you have had an opportunity to review the above, please call me at 212-436-5518 or fax me at 212-653-5315 so that we may discuss our request for information and the date to commence fieldwork. If you prefer, you may contact me via e-mail at dtarzia@deloitte.com. In addition, please provide me with your e-mail address and the e-mail addresses of other Toshiba employees who may assist us during this engagement. Thank you very much for your immediate attention to this matter. We look forward to hearing from you.

Sincerely,

Dale Tarzia

cc: Dennis Fischel (Discovision)

TOTAL P.03