UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------x
DISCOVISION ASSOCIATES               :
                                      :
               Plaintiff,    :    08v3693(HB)
   -against-                    :
                                        :    OPINION AND ORDER
TOSHIBA CORPORATION            :
                                      :
               Defendant.   :
--------------------------------------------------------------x

**Hon. HAROLD BAER, Jr., District Judge:**

This contract dispute concerns a license agreement pursuant to which Plaintiff Discovision Associates ("DVA") granted to Defendant Toshiba Corporation ("Toshiba") and certain of its subsidiaries a non-exclusive license of patent rights related to digital recording and playback devices. The case turns on whether certain business entities in which Toshiba has an interest are subsidiaries covered by the license agreement and, if so, the amount of royalties those entities owe to DVA. By order dated January 15, 2009, Magistrate Judge Peck bifurcated this case into liability and damages phases. Before the Court are cross-motions for summary judgment on the liability phase. For the following reasons, Toshiba's motion for summary judgment is DENIED and DVA's motion for summary judgment is GRANTED.[1]

**I.    Factual Background**

    **A. DVA-Toshiba License Agreement**

On March 31, 2003, DVA and Toshiba entered into a contract entitled Non-Exclusive Limited Worldwide Patent License Agreement for Playback and Recording Products (the "Toshiba-DVA License Agreement" or the "License Agreement"). (Decl. of Michael Traino, dated Mar. 2, 2009 ("Traino Decl.") at Ex. 1.) As set forth in the contract's first recital, the parties entered into the License Agreement "in order to avoid patent litigation" and the agreement represents a "settlement of all outstanding controversies between the parties" concerning the subject matter of the contract.

---

[1] DVA moved separately to strike the deposition testimony of Darren Miller and Julia Feldman cited in Toshiba's memorandum of law in support of its motion for summary judgment as inadmissible statements of legal conclusions. Because I conclude that the License Agreement is unambiguous as a matter of law without resort to extrinsic evidence, DVA's motion to strike the deposition testimony is DENIED as moot.

Pursuant to the License Agreement, DVA granted Toshiba a worldwide, non-exclusive, royalty-bearing license for certain patents owned by DVA (the "Licensed Patents") to, *inter alia*, make, have made, use, offer for sale, or sell digital recording and playback devices such as DVD players and DVD-R disc drives, defined collectively in the License Agreement as "Licensed Products."  In exchange for the right to make and sell Licensed Products and DVA's release of Toshiba and certain of its subsidiaries from infringement claims related to the Licensed Patents, Toshiba agreed to pay royalties, both in lump sums due on dates certain and, under circumstances germane to this dispute, per-unit royalties for each Licensed Product sold in excess of a set numerical threshold in a given fiscal year.

Pursuant to the contractual provision at the heart of this dispute, Section 3.4, the license granted to Toshiba also includes a license to Toshiba's "Subsidiaries," defined in the agreement as any corporation or other business entity that Toshiba controls through beneficial ownership of more than fifty percent of the voting interests or rights to more than fifty percent of the entity's income.  Specifically, Section 3.4 provides, in pertinent part, as follows:

> [1] The license granted herein includes a license to [Toshiba's] Subsidiaries of the same scope as the one granted to [Toshiba] in Section 3.1 above.  [2] [Toshiba] represents that its Subsidiaries include the Subsidiaries identified on Appendix A, which are involved in the manufacture of Licensed Products as of the Effective Date.  [3] [Toshiba] shall pay and account to DVA for royalties hereunder with respect to the exercise by any Subsidiary of [Toshiba] of the license granted to it hereunder, and if [Toshiba] fails to make such payment or accounting, DVA reserves the right to seek directly from such Subsidiary any royalties due and owing to DVA.  [4] Licenses will be granted to additional Subsidiaries of [Toshiba], which are not existing as of the Effective Date, during the term of this Agreement upon receipt by DVA of written notices from [Toshiba] setting forth the names and addresses of such additional subsidiaries to be covered by this Agreement.

Section 3.4 further provides that Licensed Products made or sold by a Subsidiary "added by [Toshiba] after the Effective Date" will be included in the group of Licensed Products covered by the lump-sum royalty payments, "so long as the consolidated total unit sales of [Toshiba] and its Subsidiaries existing as of the Effective Date (hereinafter referred to as "Pre-existing Subsidiary") and all of such added Subsidiaries does not exceed [a set number of] units for each fiscal year."  Thus, Toshiba agreed that it would be liable for per-unit royalties for each Licensed Products sold by Subsidiaries formed after the effective date in

excess of the annual numerical threshold.  According to DVA, this dispute concerns just such a situation.

**B.**      **Toshiba-Samsung Business Integration Agreement**

Wholly separate from its agreement with DVA, Toshiba entered into an agreement dated January 13, 2004 with Samsung Electronics Co., Ltd ("Samsung") pursuant to which Toshiba and Samsung agreed to integrate into a worldwide joint venture their respective businesses related to "development, manufacture and sales of optical disc drive[s] ("ODD")."   (Decl. of Paul Stewart, dated March 4, 2009, ("Stewart Decl.") Ex. Q ("Toshiba-Samsung Agreement")).   The Toshiba-Samsung agreement contemplated the formation of two entities—a parent Japanese corporation and a subsidiary Korean corporation (collectively "TSST") and that Toshiba would hold a fifty-one percent majority interest in the parent corporation.  TSST would be in the business of, *inter alia*, design, development, manufacture, marketing and sales of finished and semi-finished ODD devices. Both TSST entities were formed on April 1, 2004—just over one year after the March 31, 2003 effective date of the Toshiba-DVA License Agreement—and Toshiba never gave written notice to DVA setting forth the name and address of either TSST entity as subsidiaries to be covered under the License Agreement.  (Toshiba 56.1 Stmt. ¶¶4-5.)  The principal issue here is whether the TSST entities are subsidiaries covered by the License Agreement.  In the event of an affirmative answer, the amount of royalties owed by TSST will be determined by a subsequent damages phase.

**C.  DVA-Samsung License Agreement**

The third contractual relationship of some relevance to this litigation is a patent license agreement entered into between DVA and Samsung in 2001 (the "DVA-Samsung Agreement").  The DVA-Samsung Agreement grants to Samsung an earlier non-exclusive license to use the same patents covered by the License Agreement between DVA and Toshiba.  (Stewart Decl. Ex D.)  Toshiba also seeks summary judgment that it is not liable for royalty payments for products manufactured by Samsung's manufacturing subsidiaries, sold to the Korean TSST entity ("TSST-K") and, subsequently sold back to Samsung subsidiaries.  Toshiba contends that Licensed Products that "passed through" TSST-K were already licensed by DVA under the DVA-Samsung Agreement and DVA wrongfully seeks to collect two royalties for the same product.  Toshiba further argues that under the doctrine of "patent exhaustion" DVA's patent rights were extinguished upon the first sale of the

Licensed Products. DVA rejoins that Toshiba misreads the DVA-Samsung Agreement which differs from the Toshiba License Agreement in certain material respects. Consequently, the meaning and import of certain terms of the DVA-Samsung Agreement is also before me.

### D.  Procedural History

DVA filed this action in April 2008 to enforce its rights under Section 6.7 of the License Agreement to conduct an audit of Toshiba and its Subsidiaries to determine the amount of royalties due under the contract.  On October 7, 2008 I denied DVA's motion for summary judgment on its right to an audit because I found a genuine issue of material fact to exist as to the permissible scope of the audit.  After fruitless attempts at settlement, this action was bifurcated into liability and damages phases, and the issue of permissible scope of DVA's audit rights is now squarely before me.   The instant motions require me to decide only two narrow issues:  whether the TSST entities are "Subsidiaries" under the License Agreement and whether Toshiba owes royalty payments for Licensed Products manufactured by Samsung and which "passed through" TSST.  Both issues are resolved by interpretation of the contracts before me.  The interpretation of those contracts reached herein will hopefully guide settlement negotiations and avoid further litigation.

### II.      Legal Standard and Applicable Law

### A.      Summary Judgment

"Summary judgment is a tool to winnow out from the trial calendar those cases whose facts predestine them to result in a directed verdict." *United National Insurance Co. v. Tunnel, Inc.*, 988 F.2d 351, 355 (2d Cir. 1993).  A court may grant summary judgment "only if it can be established that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Opals on Ice Lingerie v. Bodylines Inc.*, 320 F.3d 362, 367-68 (2d Cir. 2003). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby,* 477 U.S. 242, 247-48 (1986).

The court must resolve all ambiguities and draw all inferences in favor of the non-moving party. *Id.* at 255.  "If there is any evidence in the record from which a reasonable inference could be drawn in favor of the non-moving party on a material issue of fact, summary judgment is improper."  *Holt v. KMI-Continental, Inc.,* 95 F.3d 123, 129 (2d Cir.

1996).  Where, as here, both parties move for summary judgment the court is not required to grant judgment as a matter of law for one party or the other.  *Morales v. Quintel Entm't., Inc.*, 249 F.3d 115, 121 (2d Cir. 2001).  "Rather, each party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration." *Id.*

**B.      Applicable Law**

The substantive law of the State of New York governs interpretation of the License Agreement.  The License Agreement expressly provides that it will be construed in accordance with the laws of the State of New York and the parties' briefs assume that New York law controls which is sufficient to establish choice of law. *Krumme v. WestPoint Stevens Inc.*, 238 F.3d 133, 138 (2d Cir. 2000).

**III.      Discussion**

**A.  Contentions of the Parties**

Liability in this case turns largely on the meaning of Section 3.4 of the License Agreement, which, as explained below, must be read in light of the entire agreement. Toshiba's principal contention is that pursuant to Section 3.4 it has an "option" to add a Subsidiary created after the effective date by providing notice to DVA in accordance with the fourth sentence of Section 3.4.  In Toshiba's view, unless and until such notice is provided to DVA, a newly created Subsidiary is not covered by the License Agreement no royalties are to be paid and if said subsidiary deals in Licensed Products they are subject only to liability for patent infringement.

DVA, on the other hand, maintains that Toshiba's interpretation of the License Agreement would make "a shell game" out of the License Agreement because it would allow Toshiba to avoid paying royalties by forming new Subsidiaries and unilaterally electing not to provide DVA with notice of their existence.  Under DVA's reading of Section 3.4, the grant of a license to Toshiba's Subsidiaries in the first sentence of the provision extends to existing *and* future Subsidiaries and the notice requirement in the fourth sentence is for DVA's own benefit: namely, to ensure that DVA knows about each newly formed or acquired Toshiba Subsidiary so it may collect royalties from them and avoid suing them for patent infringement.  Both parties offer extrinsic evidence that they contend supports their interpretation of the License Agreement.

5

### B.  Principles of Contract Interpretation

The touchstone of contract interpretation is that the agreement should be construed to give effect to the intent of the parties as revealed by the language of the contract itself.  *See, e.g., Bolt Electric, Inc. v. City of New York*, 223 F.3d 146, 150 (2d Cir. 2000).  "The goal of the Court is "to interpret the language of the contract in a practical manner such that the parties' reasonable expectations will be realized.  *Gillman v. O'Connell,* 176 A.D.2d 305, 307 (2d Dep't 1991) (citing *Brown Bros. Electrical Contractors v. Beam Constr. Corp.,* 41 N.Y.2d 397, 400 (1977)).  "A contract should be construed in accordance with the parties' purpose [and] a fair and reasonable interpretation, consistent with that purpose, must guide the courts in enforcing the agreement." *Wong v. New York Times Co.*, 297 A.D.2d 544, 547 (1st Dep't 2002) (internal citations omitted).

The threshold question is whether the License Agreement is ambiguous. If the language of the contract is found to be ambiguous, the differing interpretations of the contract generally present a triable issue of fact. *Golden Pacific Bancorp v. F.D.I.C.*, 273 F.3d 509, 515 (2d Cir. 2001) (quoting *Bank of America National Trust and Savings Association v. Gillaizeau,* 766 F.2d 709, 715 (2d Cir.1985)).  Extrinsic evidence of the parties' actual intent may only be considered if the contract is found to be ambiguous as a matter of law. *South Road Associates, LLC v. Intern. Business Machines Corp.*, 4 N.Y.3d 272, 278 (2005).  "Where a contract is unambiguous, that is, where its words convey a definite and precise meaning upon which reasonable minds could not differ, its interpretation can be determined as a matter of law." *Bolt Electric,* 223 F.3d at 150 (citing *Seiden Associates  v. ANC Holdings, Inc.,* 959 F.2d 425, 428 (2d Cir. 1992)).

### C.  Is the License Agreement Ambiguous?

"'The language of a contract is ambiguous if it is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement.'" *Golden Pacific Bancorp*, 273 F.3d at 516 (quoting *Krumme,* 238 F.3d at 138-39).  "Ambiguity is determined by looking within the four corners of the document, not to outside sources."  *Kass v. Kass*, 91 N.Y.2d 554, 566 (1998).  But "the court must look to *all* corners of the document rather than view sentences or clauses in isolation." *International Klafter Co. v. Continental Cas. Co.,* 869 F.2d 96, 99 (2d Cir. 1989) (emphasis added and internal quotation marks omitted).  The New York Court of Appeals has counseled that in deciding whether a contract is ambiguous, a court

> "should examine the entire contract and consider the relation of the parties and the circumstances under which it was executed.  Particular words should be considered, not as if isolated from the context, but in the light of the obligation as a whole and the intention of the parties as manifested thereby.  Form should not prevail over substance and a sensible meaning of words should be sought."

*Kass*, 91 N.Y. 2d at 566 (quoting *Atwater & Co. v Panama R. R. Co.,* 246 NY 519, 524 (1927)). A contract, however, is not ambiguous "'merely because the parties urge different interpretations in the litigation.'" *TLC Beatrice Intern. Holdings, Inc. v. CIGNA Ins. Co.*, 97 Civ. 8589(MBM), 2000 WL 282967, *3 (S.D.N.Y. Mar. 16, 2000) (quoting *Hunt Ltd. v. Lifschultz Fast Freight, Inc.,* 889 F.2d 1274, 1277 (2d Cir.1989); *New York City Off-Track Betting Corp. v. Safe Factory Outlet, Inc.*, 28 A.D.3d 175, 177-178, (1st Dep't 2006) (assertion by a party that contract language means something other than what is clear when read in conjunction with the whole contract is not enough to create an ambiguity sufficient to raise a triable issue of fact).

### 1. Standing Alone, Section 3.4 is Ambiguous

Toshiba asserts three arguments in support of its interpretation of the plain language of Section 3.4, which it contends is devoid of ambiguity.   First, Toshiba argues on the basis of common sense and the plain language of the provision that the first sentence of Section 3.4 grants licenses only to Subsidiaries existing on the effective date and the fourth sentence provides that licenses will be granted to *new* Subsidiaries if and only if Toshiba notifies DVA of their existence.  Toshiba argues that use of the future tense in conjunction with the notice concept—i.e. license agreements *will be granted upon receipt of notice*—means that new Subsidiaries are not covered in the general grant of the first sentence and thus not licensed until notice is provided. Toshiba goes on to argue that the fourth sentence grants it a right to unilaterally elect whether a new Subsidiary is covered by the License Agreement by either providing or withholding notice of its existence.  Because the fourth sentence does not expressly obligate Toshiba to provide notice to DVA and states that licenses *will* be granted, Toshiba's is a plausible interpretation of Section 3.4 when it is considered in isolation. It is not, however, the only one.

There is an alternative explanation for the drafters' use of the future tense in conjunction with a notice concept in the fourth sentence of Section 3.4.  As of the effective date, the newly created Subsidiaries did not exist and thus a *contemporaneous* grant of a

license pursuant to the first sentence poses conceptual, if not metaphysical, difficulties.  The fourth sentence can be read to resolve such tensions by clarifying that the *new* Subsidiaries—though within the general category of grantees in the first sentence—will not receive their license until they have been formed:  new Subsidiaries *will* exist, and when they do "Licenses *will* be granted."  The drafters could have expressly provided in the first sentence that the grant to Subsidiaries extends to *both* existing and future subsidiaries (and the instant litigation would likely have been avoided if they had), but their failure to do so does not foreclose such an interpretation because the term "Subsidiary" is defined on the basis of control, not the date of an entity's formation. Furthermore, the link in the fourth sentence between extending licenses to newly formed Subsidiaries and receipt of notice of their existence need not operate as a condition-precedent to have a functional role within the provision.[2]  Without receiving notice, DVA would not know that a new Subsidiary had been formed and without knowing the new Subsidiary's address DVA would have no means to directly collect royalties from them, as is permitted by the third sentence of Section 3.4.  Under this reading, the fourth sentence of Section 3.4 does not grant an option to Toshiba, but rather ensures that DVA has notice of any new Subsidiaries when they are created.  In short, the plain language of Section 3.4 is susceptible to more than one interpretation.

Second, Toshiba argues that to construe the first sentence of Section 3.4 to *automatically* grant licenses to newly created subsidiaries renders the fourth sentence meaningless, in contravention of the rule to avoid surplusage. *See, e.g., Ronnen v. Ajax Elec. Motor Corp.*, 88 N.Y.2d 582, 589 (1996).  Although the rule is sound, its application here is not dispositive.  As discussed above, the fourth sentence of Section 3.4 may read to ensure

---

[2] Toshiba claims that it does not interpret the fourth sentence to establish a condition precedent but rather to create an option, exercise of which is accomplished by providing notice.  But this really is a distinction without a difference because either way, under Toshiba's reading, a new Subsidiary is not licensed unless and until notice is received.  "'A condition precedent is an act or event, other than a lapse of time, which, unless the condition is excused, must occur before a duty to perform a promise in the agreement arises'" *Aetna Cas. and Sur. Co. v. Aniero Concrete Co., Inc.*, 404 F.3d 566, 597 (2d Cir. 2005) (quoting *Oppenheimer & Co. v. Oppenheim, Appel, Dixon & Co.*, 86 N.Y.2d 685, 737 (1995)). If, as Toshiba urges, the fourth sentence of Section 3.4 is construed to grant Toshiba an option to add new Subsidiaries to the License Agreement, exercise of that option by delivery of notice is a condition precedent to their being covered by the License Agreement.  "[T]he actual exercise of an option contract by the optionee is the performance of a condition precedent to the optionor's duty to perform." *Saewitz v. Epstein*, 6 F.Supp.2d 151, 157 (N.D.N.Y. 1998) (citing 4 ARTHUR L. CORBIN, CORBIN ON CONTRACTS § 264 (1951)).

that *if* new Subsidiaries are formed—and, pursuant to DVA's interpretation of the first sentence, the license "automatically" extends to Toshiba's Subsidiaries—*then* DVA will know that the Subsidiaries exist and where to send invoices for royalties.  Toshiba places reliance on *Flexi-Van Leasing v. Isaias*, 23 F.Supp. 2d 419, 423-24 (S.D.N.Y. 1998), a case about a contract to guaranty debts arising from unspecified leases between two companies.  There the court rejected the plaintiff's argument that the guaranty applied not only to existing debts but also future debts, in part because such an interpretation would have rendered a clause in the contract meaningless.  *Flexi-Van*, 23 F.Supp. 2d at 423.  But Toshiba fails to mention that the court in that case also relied on principles of law unique to guaranties:  namely, that they are strictly construed in favor of the guarantor and against the drafter and that unless the plain meaning of a guaranty "clearly import[s] a continuing liability, it will be limited to the transaction for which it was given." *Id.* (citing *Dunkirk Trust Co. v. Schmitt,* 316 F.2d 537, 539 (2d Cir. 1963)); *see also Orix Financial Services, Inc. v. Precision Charters, Inc.*, No. 05 Civ. 9346 (KMW), 2007 WL 2042499, *2 (S.D.N.Y. Jul, 13, 2007).  Similar principles are not applicable here.[3]

Third, Toshiba argues that DVA's interpretation of Section 3.4 violates the axiom that specific provisions take precedence over general provisions, but as the case cited by Toshiba notes, the principle typically applies where there is an inconsistency between the specific and the general provisions. *See Muzak Corp. v. Hotel Taft Corp.*, 1 N.Y. 2d 42, 46-47 (1956); *see also Board of Education, Yonkers City School District v. CNA Ins. Co.*, 839 F.2d 14, 18 (2d Cir. 1988) ("Normally, where broad and specific language conflict, the specific language would control.").  Here, both Toshiba and DVA argue that their interpretation of the fourth sentence is consistent with Section 3.4 as a whole.  Although specific words may be read to limit the meaning of general words where there is no "'true conflict' between two provisions," *Aramony v. United Way of America*, 254 F.3d 403, 413 - 414 (2d. Cir. 2001) (quoting 11 Richard A. Lord, *Williston on Contracts* § 32:10, at 449 (4th ed.1999), here it is not clear precisely *how* the fourth sentence of Section 3.4 qualifies the

---

[3] Nor is strict construction of the License Agreement in Toshiba's favor warranted for the sort of policy reasons that underlie the protections afforded a guarantor.  Unlike one who signs a continuing guaranty and receives only the possibility of enlarged obligations in return, Toshiba stood to benefit from the extension of licenses to its Subsidiaries—at least until the minimum threshold was reached—because it secured protection from patent infringement liability.

first:  does it grant Toshiba an option to add new Subsidiaries to those covered by the License Agreement, or does it clarify that Toshiba must provide DVA notice of new Subsidiaries already covered by the general grant in the first sentence?

Examination of the whole of Section 3.4, which is divided into two paragraphs, provides further food for thought.  The first sentence grants licenses to Subsidiaries generally, without regard to when they were formed.  In the second sentence Toshiba represents that its Subsidiaries "*include*" the entities listed on Appendix A, but not that they are *limited* to those entities.  If the drafters had intended to limit the grant in the first sentence of Section 3.4, the obvious place to distinguish between pre-existing Subsidiaries and those created after the effective date would have been in the first or second sentence. But the term "Pre-existing Subsidiary" (i.e. Subsidiaries existing as of the effective date) is not defined until the second paragraph, which sets forth the numerical threshold that triggers Toshiba's obligation to pay per-unit royalties on Licensed Products sold by Subsidiaries created *after* the effective date.  That the parties defined the term in the second paragraph of Section 3.4—where a clear distinction between new and old Subsidiaries is of unmistakable significance—but did not define it in the first sentence of Section 3.4—where licenses are simply granted to "Subsidiaries"—suggests, albeit obliquely, the absence of an intent to distinguish between new and old Subsidiaries in the first sentence.  On the other hand, the second paragraph speaks of a "Subsidiary *added* by [Toshiba] after the Effective Date," (emphasis added) which provides a modicum of support for Toshiba's contention that it has discretion to bring Subsidiary entities within the ambit of the License Agreement. Viewed in isolation, then, Section 3.4 is ambiguous.

## 2.  Considered in the Context of the Entire Agreement, the Ambiguity of Section 3.4 is Eliminated.

The foregoing conclusion does not, however, end the inquiry or lead inexorably to a finding that triable issues of fact remain.  Section 3.4 must be examined in the context of the entire License Agreement. "Where consideration of a contract as a whole resolves the ambiguity created by one clause, there is no occasion to consider extrinsic evidence of the parties' intent," and thus no issue for trial.  *Hudson-Port Ewen Associates, L.P. v. Chien Kuo*, 78 N.Y.2d 944, 945 (1991) (citing *W.W.W. Assocs. v Giancontieri,* 77 N.Y. 2d 157, 162-163 (1990)).  "Where the document makes clear the parties' over-all intention, courts examining isolated provisions 'should then choose that construction which will carry out the

plain purpose and object of the [agreement].'"  *Kass*, 91 N.Y. 2d at 566 (quoting *Williams Press v State of New York,* 37 N.Y.d 434, 440 (1975)).

The first recital of the License Agreement makes clear that a principal purpose of the contract is to "avoid patent litigation" and this clause may be used to assist in interpreting the ambiguous Section 3.4.  *See Aramony*, 254 F.3d at 413 (statement in recital or "whereas" clause may be useful to interpret an ambiguous operative clause in a contract, although it cannot create new rights beyond those arising from the contract's operative terms).  The necessary implication of Toshiba's proffered interpretation of Section 3.4, however, is directly contrary to this purpose.  Toshiba argues that because it never exercised its "option" to have the TSST entities covered by the License Agreement, those subsidiaries never received a license and if they did sell any products incorporating DVA's patents, "DVA's remedy is a patent infringement suit against TSST."  (Defts. Mem. Supp. at 1.)  But interpreting Section 3.4 to grant Toshiba the right make a unilateral election to either (a) notify DVA of a newly created Subsidiary that will make or sell License Products or (b) withhold such notice and risk being sued for patent infringement is not reasonable in light of the contract's express purpose to avoid precisely such litigation. *See*, *e.g., IBM Credit Financing Corp. v. Mazda Motor Mfg. (USA) Corp.,* 245 A.D.2d 78 (1st  Dep't 1997) (citing *Westbury Post Ave. Assocs. v Great Atl. & Pac. Tea Co.,* 46 A.D. 2d 860, *aff'd* 38 N.Y. 2d 890) (rejecting proffered interpretation of contract that would have "made no economic sense for defendant and would have frustrated defendant's explicit central purpose in entering into the transaction.")  Indeed, Toshiba reads the agreement in a way that entitles it to a contractual right to conduct a cost/benefit analysis between the risk of being assessed per-unit royalties and the risk DVA will discover an undisclosed Subsidiary and prosecute a patent infringement suit to judgment.

DVA argues that Toshiba's reading of the License Agreement makes a "shell game" out of the License Agreement. (Pl.'s Mem. in Supp. at 1.)  Toshiba counters that DVA's "shell game theory is a house built upon sand" because per-unit royalties are *only* due if a new Subsidiary is created and there is no limit on the number of units that Toshiba and its "Pre-existing Subsidiaries" can sell.  (See Defts' Mem. in Opp'n. at 6.)  But without relying on extrinsic evidence, DVA's interest in avoiding the "shell game" is easily discerned. Through its own due diligence prior to signing the License Agreement, DVA could have reasonably estimated the capacity of Toshiba and its *existing* subsidiaries to manufacture

and sell optical disc drives using the DVA patents.  But the manufacturing or sales capacity of Toshiba's potential partnerships represents a complete unknown.  It would be reasonable for DVA to negotiate for a right to share in the "upside" if Toshiba entered a partnership that expanded its capacity to make or sell Licensed Products.  But it is *not* reasonable to ascribe an intent to the parties to enter into a contract that grants Toshiba the unqualified right to either notify DVA of the existence of new Subsidiaries that deal in Licensed Products or take their chances in patent litigation, particularly so where, as here, the contract was negotiated by counsel for sophisticated parties.  "[W]here contracts are negotiated by counsel for sophisticated commercial parties, courts should interpret ambiguous language to realize the *reasonable* expectations of the ordinary businessperson."  *Bank of New York v. Amoco Oil Co.*, 35 F.3d 643, 662 (2d Cir. 1994) (emphasis added).

A contract is only ambiguous when it is susceptible to more than one *reasonable* interpretation, and an interpretation of a contract that creates rights that, if exercised, directly contravene the express purpose of the contract is not a reasonable interpretation. Consequently, I conclude that the License Agreement is not ambiguous as a matter of law. Section 3.4 grants licenses to all entities that meet the License Agreement's definition of "Subsidiaries"—whether such entities were in existence as of the effective date or formed thereafter.  To the extent that during the relevant periods Toshiba did, in fact, have a fifty-one percent beneficial ownership of either TSST entity, such entities are "Subsidiaries" covered by the License Agreement.

### D.  The Samsung Products

Toshiba also seeks summary judgment that it owes no royalties for products that were manufactured by Samsung but "passed through" TSST-K after being manufactured and before being sold by Samsung's retail subsidiaries.  Toshiba contends that as a matter of law the initial authorized sale of the Licensed Product from Samsung's manufacturing subsidiary to TSST-K terminated all of DVA's patent rights to that product and that DVA cannot collect two royalties for the same physical product.  "The longstanding doctrine of patent exhaustion provides that the initial authorized sale of a patented item terminates all patent rights to that item."  *Quanta Computer, Inc. v. LG Electronics, Inc.*, 128 S.Ct. 2109, 2115 (2008).  But here, the question is not whether a sale of a Licensed Product from Samsung to TSST-K extinguishes DVA's patent rights. Rather, the question is whether (a) a per-unit royalty is due for that product, and (b) whether it is due from Samsung or Toshiba.  As the

Supreme Court noted in *Quanta*, the Court's conclusion that the license agreement at issue authorized the sale in question "does not necessarily limit [the patent holder's] other contract rights." *Id.* at 2122 n.7.   There, the patent holder did not assert a breach-of-contract claim and the Court expressly withheld opinion "on whether contract damages might be available even though exhaustion operates to eliminate patent damages." *Id.*  In short, exhaustion of patent rights through a sale is not necessarily determinative of who bears contractual liability for royalties as a result of that sale.

Here, because I have concluded that TSST-K is a "Subsidiary" licensed under the DVA-Toshiba License Agreement, the "pass through" Licensed Products fall into the category of products for which a per-unit royalty is due under the DVA-Samsung Agreement. Specifically, Section 2.23(ii)(a) of the Samsung Agreement provides that products for which a per-unit royalty is due include Licensed Products "transferred by [Samsung] to a third party: . . . (ii) where such Licensed Products are covered under a separate former or current license from DVA to manufacture: (a) the delivered Licensed Product."   Furthermore, pursuant to Section 5.6.1 of the DVA-Samsung Agreement, Samsung is not obligated to pay per-unit royalties for any Licensed Product "manufactured by [Samsung] for any other DVA licensee, so long as the other DVA licensee has fully paid the royalty rate set forth in . . . the other licensee's agreement and reported royalties to DVA." Finally, Section 3.1 of the DVA-Toshiba License Agreement grants Toshiba a royalty-bearing license to "have [Licensed Products] made," which could extend to products manufactured by Samsung for TSST-K.

In short, although DVA is not entitled to collect two royalties for each Licensed Product that passed through TSST-K, neither is it obligated to forego the benefits of its bargain because Toshiba and Samsung each contend that the other is responsible for the royalties.  Under a fair reading of both License Agreements, there are no interstices into which the pass-through products fall, escaping royalties:  either royalties are due under the DVA-Samsung Agreement because TSST-K is not another DVA licensee or they are due under the DVA-Toshiba License Agreement because TSST-K is covered by the license granted thereby.   Because I have concluded as a matter of law that TSST-K is a Subsidiary covered by the Toshiba License Agreement, I cannot conclude as matter of law that no royalties are due on the "pass-through" products.  Questions such as whether TSST-K in fact received and resold Licensed Products manufactured by Samsung, and whether Samsung in

fact accounted to DVA for royalties on such products are questions for the damages phase of this litigation.

## CONCLUSION

For the foregoing reasons, Plaintiff DVA's motion for summary judgment is GRANTED and Defendant Toshiba's motion for summary judgment is DENIED. The parties will submit a proposed scheduling order for the damages phase of this litigation within thirty (30) days of this Order. The Clerk of the Court is instructed to close this motion and remove it from my docket.

**SO ORDERED**
**May ⎸⎸,2009**
**New York, New York**

Harold Baer

U.S.D.J.

14